# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIEQUON AUNDRAY COX,
          *Petitioner-Appellant,*

v.

ROBERT L. AYERS, Warden,
California State Prison at San
Quentin,
          *Respondent-Appellee.*

No. 07-99010

D.C. No.
CV-92-03370-CBM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
February 5, 2009—Pasadena, California

Filed December 10, 2009
Amended July 22, 2010

Before: Harry Pregerson, Susan P. Graber, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Pregerson

**COUNSEL**

Jeannie R. Sternberg, Habeas Corpus Resource Center, San Francisco, California, for the petitioner-appellant.

Jamie L. Fuster, Deputy Attorney General, State of California, Los Angeles, California, for the respondent-appellee.

**ORDER**

The opinion filed December 10, 2009, slip opinion page 16243, and appearing at 588 F.3d 1038, is amended as follows:

On slip opinion page 16248, replace footnote 1 with the following: "We dispose of three additional issues as to which the district court did not issue a certificate of appealability, but as to which we did issue such a certificate, in a separate memorandum disposition filed this date."

On slip opinion page 16250, replace the first sentence of the first full paragraph with the following: "Ebora Alexander's son, Neal, and her 14-year-old grandson, Ivan Scott, were in the house when Williams and Petitioner entered."

On slip opinion page 16250, on line 4 of the first full paragraph after "gunshot," add the following footnote 2: "The California Supreme Court's statement that Neal also was a teenager is not supported by the record, which simply does not reveal his age."

On slip opinion page 16254, on line 8, at the end of the carryover paragraph, add the following footnote 3:

> Petitioner argues before this court that he was shackled at both the guilt and penalty phases. The district court found, and the record supports the finding, that Petitioner was shackled during the guilt phase only. Indeed, Petitioner asserted in his appellate brief to the California Supreme Court that he was *not* restrained during the penalty phase. Before the district court, Petitioner once again conceded that he was not restrained in the penalty phase. The trial transcript demonstrates that the trial court ordered the removal of the restraints on the last day of the guilt phase, and there is no mention of any restraint during the penalty phase. No juror observed any restraints during the penalty phase.

On slip opinion page 16257, replace the sentence starting on line 7, with the following: "The desperate efforts of the grandmother's son to stop the rampage while her 14-year-old grandson hid in a closet had no effect on Petitioner."

With these amendments, Judges Graber and Wardlaw have voted to deny the petition for rehearing and petition for rehearing en banc, and Judge Pregerson has voted to grant it.

The full court was advised of the petition for rehearing en banc. A judge of the court called for a vote on whether to rehear the matter en banc. On such vote, a majority of the nonrecused active judges failed to vote in favor of en banc rehearing.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or petitions for rehearing en banc will be entertained with respect to the amended opinion. Petitions for rehearing and petitions for rehearing en banc may be filed with respect to the memorandum disposition.

## OPINION

GRABER, Circuit Judge:

Petitioner Tiequon Aundray Cox was convicted in California state court, and sentenced to death, for the murders of four victims. In this habeas proceeding, brought pursuant to 28 U.S.C. § 2254, he challenges his convictions and death sentence on the grounds that (1) the state trial court's decision to shackle him during the guilt phase of the trial prejudiced the jury during both the guilt and penalty phases and (2) that he received ineffective assistance of counsel during the penalty phase.[1] Because Petitioner was not prejudiced by the trial court's decision to shackle him during the guilt phase of the trial, and because Petitioner received constitutionally sufficient assistance of counsel at the penalty phase, we affirm.

---

[1]We dispose of three additional issues as to which the district court did not issue a certificate of appealability, but as to which we did issue such a certificate, in a separate memorandum disposition filed this date.

## PROCEDURAL HISTORY

Petitioner was charged in a four-count indictment with the first-degree murders of victims Ebora and Dietria Alexander, Damon Bonner, and Damani Garner in violation of California Penal Code section 187. As to each count, Petitioner was further charged with the special circumstance of multiple murders under California Penal Code section 190.2(a)(3). A jury convicted him on all counts of first-degree murder and also found true the multiple-murder special circumstance allegations. Approximately one month after finding Petitioner guilty, the jury returned a verdict imposing the death penalty.

Petitioner pursued both a direct appeal and a petition for habeas relief through the state courts. On direct appeal, the California Supreme Court affirmed Petitioner's convictions and the judgment of death. Petitioner sought rehearing, which was denied. The Superior Court of Los Angeles County filed a warrant of execution. The California Supreme Court granted Petitioner's petition for a stay pending final disposition by the United States Supreme Court on a petition for writ of certiorari, which was denied. Petitioner then filed two petitions for writs of habeas corpus in the California Supreme Court, each of which was denied on the merits and on procedural grounds.

Thereafter, Petitioner filed a petition for habeas relief with the federal district court, before Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The petition was stayed pending exhaustion of some claims at the state level and, ultimately, was denied on all grounds. The district court issued a certificate of appealability for two claims: unconstitutionally shackling Petitioner during the guilt phase, and ineffective assistance of counsel during the penalty phase. Petitioner timely appealed.

## FACTUAL HISTORY

On August 31, 1984, at about 5:30 or 6:00 a.m., Darren Williams and Horace Burns arrived at the residence of Ida

Moore, where Lisa Brown was also present. Williams told Burns to pick up someone; 5 or 10 minutes later, Burns returned with Petitioner.

Williams, Burns, Moore, Brown, and Petitioner left in Moore's van, with Moore driving, Brown in the passenger seat, and the three others in the back. The group stopped for gasoline, for which Moore paid. Williams then directed them to 59th Street in Los Angeles and began looking for an address that he had written on a piece of paper. Once he had located the residence, Williams told Moore to park down the street but to leave the engine running. After they parked, Williams told Burns to stay behind. Moore asked Burns what they were going to do; Burns answered that Williams and Petitioner were "just going to shoot it up." Brown heard Williams or Petitioner say that they were going "to kill everybody in the house." Williams and Petitioner got out of the van and walked toward the Alexander residence.

Moore had seen "a big gun" in the back of the van when they stopped for gas. She also observed that Williams had a handgun in his waistband and that Petitioner was carrying something wrapped in a jacket. Shortly after Petitioner and Williams entered the house, Moore and Brown heard gunfire. Two or three minutes later, Williams ran back to the van with the handgun and told Moore to leave. Petitioner followed a minute or two later with a rifle in his hands. As he entered the van, Petitioner exclaimed: "I just blew the bitch's head off. So drive." At that point, Moore drove away quickly.

Ebora Alexander's son, Neal, and her 14-year-old grandson, Ivan Scott, were in the house when Williams and Petitioner entered. Neal awoke when he heard a scream and the sound of a gunshot.[2] He saw a man standing in his sister Dietria's room holding a rifle. The man was facing away from

---

[2] The California Supreme Court's statement that Neal also was a teenager is not supported by the record, which simply does not reveal his age.

Neal and toward his sister's bed; Neal jumped on the man's back and started fighting with him. The fight occurred near a red trunk in the bedroom, on which the police later found Petitioner's palm print. When the man hit Neal on the face, Neal ran away through the back door.

Ivan also awoke to the sound of gunshots and ran into a closet to hide. From that vantage, he saw his uncle Neal run down the hallway and heard an ensuing struggle. He also glimpsed a man carrying a rifle.

Two neighbors also witnessed relevant events. Lashawn Driver lived one or two doors away from the Alexander residence, on the opposite side of the street. She returned home at about 7:30 a.m., noticed two men enter the Alexander home, and heard about five gunshots. After Williams exited the house, she heard another series of shots. She then saw Petitioner leave the house while carrying a rifle.

Venus Webb also lived across the street. On the morning of the murders, she heard shooting and went to investigate. When she looked out her front window, she saw Petitioner leaving the Alexander house and walking rapidly toward a van, which pulled around the corner at a fast pace and then disappeared.

Upon returning to the van, Williams and Petitioner told Moore to drive away. They had her stop at Vermont Avenue and Gage Street, where Burns, Williams, and Petitioner got out and entered a building known as the Vermont Club. One or two hours later, Moore saw Williams at the home of James Kennedy, where Williams gave her $50 to purchase some personal items for him and to pay her for the gasoline. At about 9:00 a.m., Williams called Brown and directed her to bring his car to the Vermont Club. When she arrived, Brown saw Petitioner put a rifle into the trunk of the car. Brown drove Petitioner to an apartment building, into which he carried the

rifle after wrapping it in a jacket. That afternoon, Petitioner purchased a 1975 Cadillac, paying $3,000 in cash for it.

James Kennedy was a friend of Petitioner, Williams, and Burns through their gang association. Kennedy testified that, on the morning of August 31, Petitioner brought him a semi-automatic .30-caliber carbine wrapped in a jacket and instructed him to destroy it. Petitioner also asked Kennedy to have his sister wash the jacket because it had gunpowder on it. Kennedy took the jacket to his sister but did not destroy the rifle, instead hiding it in some bushes near his residence. On September 27, 1984, Kennedy was the subject of a narcotics investigation during which he revealed the location of the weapon to law enforcement officers.

Shortly after the shootings, the police were summoned to a scene of horror at the Alexander house. They found the bullet-riddled bodies of 57-year-old Ebora, her 23-year-old daughter Dietria, and two of her grandsons, 8-year-old Damon Bonner and 10-year-old Damani Garner. Ebora had been sitting at her kitchen table drinking coffee when she was killed. She suffered one wound that caused part of her brain tissue to be blown away. Dietria, Damon, and Damani lay dead in a bedroom, still in their beds. The coroner determined that all four had died of gunshot wounds to the head or body. In the course of their investigation, the police lifted a latent palm print from a red trunk located in the bedroom. Two experts concluded that only Petitioner could have made the print. The police also retrieved empty shell casings and spent bullets from the vicinity of each body. Ballistics testing established that they all came from the same semiautomatic .30-caliber carbine that Petitioner gave Kennedy to destroy.

Petitioner's counsel waived both opening statement and closing argument during the guilt phase of the trial and presented no evidence during that phase. On January 21, 1986, the jury found Petitioner guilty of four counts of first-degree murder with special circumstances.

During the penalty phase of the trial, Petitioner's counsel argued that the death penalty was not warranted because, although Petitioner was involved with the murders, Williams was the actual killer. In particular, Petitioner's counsel argued that Neal's and Ivan's descriptions of the shooter suggested that Williams, not Petitioner, was the shooter. Petitioner's counsel further argued that Williams manipulated Petitioner into participating in the murders.

The defense also presented mitigation evidence concerning Petitioner's upbringing, school environment, and gang activities. Petitioner had been abandoned at an early age by his mother, who had a drinking problem and had gone to prison for robbery. He had very little contact with his father throughout his childhood. Petitioner, along with his younger brother and sister, had been raised by his 65-year-old great-grandmother, whom Petitioner regarded as strict. For that reason, Petitioner ran away from her house at age 14 and went to live with his grandmother. At about that time, Petitioner became involved in a violent gang.

Also during the penalty phase, the defense presented vivid testimony regarding the living conditions at San Quentin Prison for those sentenced to life imprisonment without the possibility of parole. The jury was told that life in prison is very violent and lacks many amenities such as regular showers and laundry.

The prosecutor presented aggravating factors in the form of evidence about two robberies in which Petitioner had participated as a juvenile. In the spring of 1981, Petitioner and a companion accosted three junior high school students and demanded their money. Petitioner hit two of them with his fist and with a piece of mop handle. Approximately one month later, Petitioner impliedly threatened a mother with a firearm while she waited for her young son after school. Petitioner took her car and led police on a high-speed chase for half an hour through city streets, stopping only when he hit a tele-

phone pole. The police recovered a .32-caliber revolver from the driver's side of the car. The prosecutor also argued during the penalty phase that Petitioner, not Williams, was the shooter.

On February 18, 1986, after deliberating for three days, the jury returned a verdict calling for a sentence of death.

## STANDARD OF REVIEW

[1] Because Petitioner filed his original habeas petition in the district court before the effective date of AEDPA, the provisions of AEDPA do not apply. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). We review de novo the district court's denial of this petition for writ of habeas corpus. *McNeil v. Middleton*, 344 F.3d 988, 994 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 433 (2004) (per curiam).

## DISCUSSION

A. *Shackling During Trial*

Two months before the trial began, Petitioner's counsel reported to the trial court, outside of Petitioner's presence, that there was "some possibility of an escape attempt." Consequently, the trial court ordered that Petitioner be handcuffed to his chair during the first day of trial. On the first day of trial, Petitioner's counsel objected to the use of a single handcuff and requested its removal. The trial court denied that request and, on the second day of trial, ordered that Petitioner be placed in additional leg restraints because of a rumor reported by a courtroom bailiff that Petitioner intended to escape. Although Petitioner's counsel asked the trial court to remove the shackles, Petitioner remained in some form of shackles throughout the remainder of the guilt phase of the trial. At least four jurors saw the restraints restricting Peti-

tioner during the guilt phase. But Petitioner was not shackled during the penalty phase.[3]

**[2]** The appearance of a defendant in shackles before a jury in either the guilt phase or the penalty phase of a trial may constitute a violation of the defendant's right to due process. *Deck v. Missouri*, 544 U.S. 622 (2005). We have held that "a defendant has the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest." *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002); *see also Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) ("Because visible shackling during trial is so likely to cause a defendant prejudice, it is permitted only when justified by an essential state interest specific to each trial."). To demonstrate that his shackling at trial amounted to a constitutional violation, Petitioner must demonstrate: (1) that he was "physically restrained in the presence of the jury," (2) that "the shackling was seen by the jury," (3) that the "physical restraint was not justified by state interests," and (4) that "he suffered prejudice as a result." *Ghent*, 279 F.3d at 1132 (citing *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995)).

**[3]** Here, Petitioner meets the first three prongs of the inquiry. First, it is undisputed that Petitioner was shackled during the guilt phase of the trial. Second, as noted, at least four jurors observed Petitioner in shackles. Third, the shackling was not justified by state interests. A trial court may

---

[3]Petitioner argues before this court that he was shackled at both the guilt and penalty phases. The district court found, and the record supports the finding, that Petitioner was shackled during the guilt phase only. Indeed, Petitioner asserted in his appellate brief to the California Supreme Court that he was *not* restrained during the penalty phase. Before the district court, Petitioner once again conceded that he was not restrained in the penalty phase. The trial transcript demonstrates that the trial court ordered the removal of the restraints on the last day of the guilt phase, and there is no mention of any restraint during the penalty phase. No juror observed any restraints during the penalty phase.

order that a defendant be shackled during trial only if the
court first is "persuaded by compelling circumstances that
some measure is needed to maintain security of the court-
room" and if the court pursues "less restrictive alternatives
before imposing physical restraints." *Duckett v. Godinez*, 67
F.3d 734, 748 (9th Cir. 1995) (internal quotation marks omit-
ted). The California Supreme Court held, and the State does
not dispute, that the trial court erred in ordering Petitioner
shackled because the court had not attempted less restrictive
means and had not made an adequate inquiry into the need for
shackles. Accordingly, the resolution of Petitioner's claim
turns on whether the shackling prejudiced either the guilty
verdict or the death sentence.

### 1. *The Guilt Phase*

[4] In the context of a habeas proceeding, a trial error preju-
dices a defendant if it "had substantial and injurious effect or
influence in determining the jury's verdict." *Brecht v.
Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation
marks omitted). "[S]hackling during trial carries a high risk of
prejudice because it indicates that the court believes there is
a need to separate the defendant from the community at large,
creating an inherent danger that a jury may form the impres-
sion that the defendant is dangerous or untrustworthy." *Dyas
v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (per curiam)
(internal quotation marks omitted). Nevertheless, we have
held that the unconstitutional shackling of a defendant results
in prejudice only if the evidence of guilt is not "overwhelm-
ing." *Id.* In particular, if a case is "close, an otherwise mar-
ginal bias created by the shackles may . . . play[ ] a significant
role in the jury's decision." *Id.*

[5] Here, we find no prejudice at the guilt phase. The evi-
dence presented by the State was overwhelming. Petitioner's
palm print was found at the center of the crime scene. Two
eyewitnesses testified that, just before the they heard gun-
shots, Petitioner and Williams entered the home where the

murders occurred. Ballistics tests proved that a rifle in Petitioner's possession was used to fire four of the bullets found at the crime scene. Immediately after the shootings, Petitioner bragged to his compatriots that he "just blew the bitch's head off." He then tried to have a friend destroy evidence—the rifle used to kill the victims, and Petitioner's jacket, which bore gunpowder residue. Accordingly, we hold that the evidence against Petitioner was so "overwhelming" that the "marginal bias created by the shackles" had no prejudicial effect on the guilty verdict. *Dyas*, 317 F.3d at 937.

### 2.  *The Penalty Phase*

Because of the nature of the evidence, Petitioner also was not prejudiced by the guilt-phase shackles during the later penalty phase of his trial. When the jurors were considering the proper punishment, they already had concluded that Petitioner was a very dangerous person by convicting him of four cold-blooded killings.

**[6]** The Supreme Court has observed that "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process" because it "suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.' " *Deck*, 544 U.S. at 630 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)). Upon conviction, Petitioner lost the benefit of the presumption of innocence. But even assuming that the potential prejudicial effects of shackling generally would carry over from the guilt phase to the penalty phase of a trial, they did not do so here. Notably, first, Petitioner was not shackled during the penalty phase. Thus, even though Petitioner already had been convicted, and could have been viewed as even more dangerous than before conviction, if the jury drew any conclusion about the removal of the shackles it likely was that authorities no longer viewed Petitioner as particularly dangerous to society at large. Such an inference directly undercuts one of the Supreme Court's main rationales for finding prejudice when

a defendant is visibly shackled during the penalty phase. *See Deck*, 544 U.S. at 633.

[7] Second, with or without shackling, we are convinced that the jury would not have spared Petitioner's life. Petitioner murdered four people in the space of a few minutes. He gunned down four members of the Alexander family execution-style. Two of the victims were only 8 and 10 years old, shot in their beds where they lay sleeping. A third victim was a young woman, also asleep in her bed. The fourth and only awake victim was an elderly grandmother, drinking her morning coffee at the breakfast table. The desperate efforts of the grandmother's son to stop the rampage while her 14-year-old grandson hid in a closet had no effect on Petitioner. The circumstances of these heinous crimes lead us to conclude that the fact that four members of the jury saw Petitioner in shackles during the guilt phase a few weeks earlier did not have a "substantial and injurious" effect on the jury's consideration of the death sentence. *Brecht*, 507 U.S. at 623.

Other circumstances of the crimes also had demonstrated to the jury Petitioner's extreme disregard for human life. Plaintiff and his companions set out for the Alexander home with murder in mind. After killing the four victims, Petitioner said to his co-defendants, "I just blew the bitch's head off. So drive." Petitioner gave the rifle that he used to kill the family members to a friend to destroy.

Finally, the evidence showed that these were coldly premeditated murders for hire. The killings were committed execution-style. In addition, Petitioner bought a $3,000 Cadillac with cash on the afternoon after the murders.[4]

Petitioner's counsel argued to the jury that the death pen-

---

[4]The penalty-phase evidence offered by the defense, that Petitioner's great-grandmother had given him the money for the car, was discredited by a disinterested third-party bank representative.

alty was not warranted (and argues to us that there is preju-
dice) because Williams, not Petitioner, was the actual shooter.
But the jury rejected that theory on the facts. After three days
of deliberation, during which the jury asked for readbacks of
testimony regarding the identity of the shooter and for pic-
tures of both Petitioner and Williams, the jury returned a
death sentence. And, as we have explained, the evidence over-
whelmingly pointed to Petitioner, the wielder of the rifle, as
the killer.

**[8]** Considering these facts, we cannot find that even one
member of the jury would have voted for a sentence of life in
prison. Shackling Petitioner at the guilt phase did not have a
substantial and injurious effect or influence at the penalty
phase.

B.    *Ineffective Assistance of Counsel*

**[9]** Petitioner argues that he received ineffective assistance
of counsel at the penalty phase because his counsel did not
obtain all public records regarding his family; did not inter-
view additional family members, counselors, friends, or
teachers; and decided not to present retained experts as wit-
nesses. To prevail on a habeas claim of ineffective assistance
of counsel, Petitioner must establish both (1) that counsel's
performance was so deficient that it fell below an "objective
standard of reasonableness" and (2) that the deficient perfor-
mance rendered the results of his trial unreliable or fundamen-
tally unfair. *Strickland v. Washington*, 466 U.S. 668, 688
(1984).

1.    *Counsel's Performance*

In analyzing the performance of counsel, judicial scrutiny
is deferential. "[T]he court should recognize that counsel is
strongly presumed to have rendered adequate assistance and
made all significant decisions in the exercise of reasonable
professional judgment." *Id.* at 690. The burden is on Peti-

tioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.*

[10] A defense lawyer must make reasonable investigations in the course of representation. *Id.* at 691. Counsel's investigation must, at a minimum, permit informed decisions about how best to represent the client. *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable." *Strickland*, 466 U.S. at 690. A disagreement with counsel's tactical decisions does not prove that the representation was constitutionally deficient. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (per curiam).

During the penalty phase, Petitioner's counsel decided to focus on four distinct arguments. First and foremost, they argued that Williams, not Petitioner, was the shooter. Petitioner's counsel relied on the physical descriptions provided by Neal and Ivan, who testified during the guilt phase, to support their argument that Petitioner was not the shooter. Petitioner's counsel then relied on significant mitigation evidence to support their remaining three arguments: (1) that a sentence of life imprisonment is worse than a death sentence, (2) that Petitioner is a valuable human being who had a traumatic childhood, and (3) that Petitioner was unduly influenced or manipulated by his gang.

Petitioner's counsel called seven witnesses to testify on Petitioner's behalf during the penalty phase. Four of those witnesses were Petitioner's close relatives:

- Audrey Martin, Petitioner's grandmother, testified that Petitioner's mother had a drinking problem and that Petitioner's great-grandmother primarily raised him. She also testified that Petitioner rarely saw his father, that Petitioner was

skilled at sports, and that she wanted to see Petitioner live.

- Edrina Meyers, Petitioner's sister, testified that she and Petitioner were raised by their great-grandmother and that they rarely saw their parents. While crying on the stand, Ms. Meyers testified that she wanted to see Petitioner live.

- Demontray Cox, Petitioner's youngest brother, testified that their mother was abusive and alcoholic and that Petitioner ran away from their mother after she threw a vase at him.

- Annie Ellsworth, Petitioner's great-grandmother, testified that she was the primary caregiver for Petitioner and that she put him in the Boy Scouts, gave him an allowance and a bike, and gave him money to buy a car.

Two witnesses knew Petitioner as an adolescent in junior high school:

- Horace Anderson, who was an administrator at the school, testified that Petitioner displayed good behavior until about the eighth grade, at which point Mr. Anderson suspected that Petitioner became involved with a gang. At about that time, he stated, Petitioner began extorting money from younger students. He also testified that Petitioner complained to him about being attacked by older boys when Petitioner was in the seventh grade.

- Donald Baker, one of Petitioner's teachers in the eighth and ninth grades, testified that Petitioner was a good basketball player and that he chose Petitioner as the captain of his home room bas-

ketball team because of Petitioner's athletic abili-
ties and leadership qualities. Baker also testified
about the prevalence of gangs in Petitioner's
neighborhood and the influence of gangs on Peti-
tioner's junior high school.

The defense's final witness during the penalty phase was
Joey Upland, a former nurse at San Quentin State Prison. She
described the harsh conditions at San Quentin for inmates fac-
ing life imprisonment without the possibility of parole. The
apparent purpose of this testimony was to show the jury that
Petitioner would receive sufficient punishment, and would not
have a chance to hurt others, if his life were spared.

Petitioner argues that his counsel failed to provide effective
assistance by making the decision to limit the scope of the
investigation into potential mitigating evidence. Specifically,
Petitioner blames counsel for not obtaining all of Petitioner's
social service records, not investigating the information in
those records, and not interviewing dozens of other character
witnesses. Without having conducted those investigations,
Petitioner argues, his counsel "made uninformed decisions
about their penalty phase presentation." Petitioner also claims
that his counsel "failed to provide retained experts with rele-
vant information and ultimately called none as witnesses."

"To establish deficient performance, a petitioner must dem-
onstrate that counsel's representation 'fell below an objective
standard of reasonableness.' " *Wiggins v. Smith*, 539 U.S.
510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). Here,
Petitioner's counsel obtained preliminary information about
Petitioner's upbringing from Petitioner himself and from his
uncle, Brady Armstrong. Counsel then instructed their investi-
gators "to unearth as many . . . people as possible" to deter-
mine

> how long they have known [Petitioner], what their
> opinion of him as an individual is, his reputation in

> the community, knowledge of his family life, his
> achievements as well as his failures, his personality,
> potential for violence, what kind of child he was,
> what kind of person he is now.

Counsel asked the investigators to locate, interview, and obtain as much information as possible from nine family members, as well as to locate and interview school, parks and recreation, and California Youth Authority ("CYA") personnel; church, Boy Scouts, and Cub Scouts members; and employers who may have remembered Petitioner.

Counsel subpoenaed, obtained, and read Petitioner's CYA and school records. The CYA records included a report in which Petitioner referred to his mother as a child abuser but described the relationships with his great-grandmother, with whom he lived most of his life, and with his grandmother, as satisfactory. A psychiatric report stated that Petitioner displayed no overt signs of anxiety or depression, that there were no signs of organic impairment or psychotic thought process, and that he was not suicidal or homicidal. Other reports described him as having mastered the "appropriate response" when confronted by authority figures but also as continuing to be dangerous to the community. Petitioner was described as having a leadership role in his gang. Aside from some fights, nothing in the records suggested that Petitioner was traumatized or subject to any mistreatment while at the CYA.

Counsel personally interviewed Petitioner's father James, mother Sondra, grandmother Audrey, great-grandmother Ellsworth, sister Edrina, and uncle Brady Armstrong. Other than mentioning that Sondra had beaten and lost custody of her children more than once, none of the witnesses mentioned that Petitioner had suffered extensive or significant abuse or anything that might cause Petitioner to grow up emotionally disturbed. Petitioner and the other witnesses (except for Sondra) identified Ellsworth as Petitioner's main caretaker until the age of 14. They pointed out that Ellsworth provided a safe and

fairly good home for him, as he participated in sports and the Boy Scouts. Sondra was described as a prostitute and drug addict who did not take care of Petitioner. Demontray Cox, in a separate interview with one of counsel's investigators, confirmed that he and his siblings were raised mostly by Ellsworth, that they had a fairly normal childhood, and that Petitioner played sports and was in the Boy Scouts. CYA records also corroborated counsel's conclusion that Ellsworth was Petitioner's primary caregiver and that Petitioner had had only sporadic contacts with his mother.

Counsel requested their investigators to contact and interview 10 individuals identified in the CYA records. The investigators interviewed those individuals, who largely provided negative or unhelpful information about Petitioner and his gang activities.

Petitioner's refusal to cooperate with certain potential defenses, including abuse and gang domination, and his wavering preference for death over life without parole, further affected counsel's actions. Counsel interviewed Petitioner at least 10 times between November 1984 and November 1985. Petitioner did not mention having suffered any physical or mental abuse, refused to talk about abuse or other wrongdoing by his mother, and threatened to cause a disturbance at trial if negative information about Sondra were presented at trial. Because counsel could retrieve no evidence of family abuse from Petitioner, they attempted to obtain such evidence from other family members, as described above.

Petitioner further refused to provide counsel with information that could have supported two penalty-phase strategies that counsel were considering: that Petitioner was not the shooter and that he was dominated by his gang at the time of the murders. Instead, Petitioner simply denied being at the crime scene, denied being controlled by his gang, and threatened to cause a disturbance at trial if counsel presented evidence to show that he was under the influence of his gang at

the time of the murders. To encourage Petitioner to open up about his gang activities, counsel retained the services of two former gang members who visited Petitioner several times in an effort to bring him "to the full understanding of the importance for him to cooperate with" counsel. That strategy failed, and Petitioner continued to refuse to cooperate in developing the suggested defense.

Counsel also interviewed Larry Norman, a counselor at a local youth center, to obtain information about Petitioner's gang involvement. Norman mentioned rumors that Petitioner carried a gun frequently and was a gang "shooter" and "enforcer." Counsel understandably did not try to corroborate this highly damaging information.

Counsel retained two gang experts, John Quicker and Fred Williams, to assist in the case. Counsel gave them information about Petitioner and obtained a court order allowing Fred Williams to interview Petitioner in jail. Counsel wanted Williams to encourage Petitioner to open up and discuss his gang involvement. Ultimately, neither Quicker nor Williams obtained any specific information that Petitioner was dominated or controlled by other members of his gang at the time of the murders. Thus, if called as witnesses, they would not have testified about any gang dominance by others.

[11] "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Indeed, the Supreme Court has stated:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney per-

> formance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689 (citations omitted). Thus, as long as a reasonable investigation was conducted, a reviewing court should defer to counsel's strategic choices.

[12] The Supreme Court's recent decision in *Bobby v. Van Hook*, 130 S. Ct. 13 (2009) (per curiam)—a pre-AEDPA case like this one—further convinces us that counsel's investigation in this case met the standard for constitutionally sufficient representation. There, the Court overturned the Sixth Circuit's grant of habeas relief to a murderer who had been sentenced to death. Defense counsel in *Van Hook* spoke with the defendant's mother, father, and aunt, and with a family friend; met with two expert witnesses; reviewed military and medical records; and considered enlisting a mitigation specialist. *Id.* at 18. Counsel also presented evidence about the defendant's traumatic childhood experiences and about his impairment (including consumption of drugs and alcohol) on the day of the crime. *Id.* The Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of the defendant's relatives or the therapists who treated his parents. *Id.* at 19. As in *Strickland*, defense counsel's decision not to seek more mitigating evidence was a reasonable professional judgment; at some point, additional evidence would be only cumulative, "and the search for it distractive from more important duties." *Id.*

[13] As summarized above, in the present case, counsel's thorough mitigation investigation was more than reasonable. Counsel interviewed most of Petitioner's close relatives, CYA counselors, school teachers, and other people familiar with Petitioner's background. They received lengthy discovery from the prosecution, as well as school and CYA records.

Counsel reasonably concluded that, aside from some abuse at the hands of his mother, Petitioner did not suffer significant abuse or impoverishment during his childhood. Petitioner's family members testified that Petitioner was loved and cared for by Ellsworth, his primary caregiver, and that the only abuse he suffered was by his mother, with whom he had stopped living immediately after the abuse.

Counsel reasonably decided not to present, and not to look further for, evidence concerning Petitioner's character and emotional state. That decision reflected counsel's strategic choice to emphasize their primary argument at the penalty phase: that Petitioner was not the shooter. Petitioner's lead counsel reasonably believed that it would not save Petitioner's life to argue to the jury that "this poor abused kid murdered four people and you should feel sorry for him," or that Petitioner "killed four people but he was beaten up by his mother when she was drunk and wasn't treated right as a kid, therefore, you should give him life." Presenting all available evidence about Sondra's abusive conduct and Petitioner's experiences with gang and CYA violence would only have raised inferences that his abusive childhood turned him into a hardened criminal who was quite capable of murdering four people. Indeed, portraying Petitioner in such a way would have shown that he was insensitive to violence because of his active participation in a violent gang, which consequently would have made it seem more likely that he was the shooter.

**[14]** In short, counsel conscientiously and extensively investigated potential defenses. Because further evidence about Petitioner's childhood and gang activity would have suggested violent propensities at odds with counsel's goal of portraying Petitioner as less culpable, counsel reasonably decided not to present such evidence. Counsel's performance fully met constitutional standards. *See Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009) (denying a habeas claim for ineffective assistance of counsel during the penalty phase where there were a significant amount of aggravating circumstances

and the additional evidence would have been cumulative of what had already been presented).[5]

## 2.  *Prejudice*

**[15]** Even if we were persuaded that counsel performed ineffectively, we would have to conclude that Petitioner failed to show prejudice. As we have noted, in order to prevail on a claim of prejudice, Petitioner must demonstrate that counsel's failure to call expert witnesses rendered the results of his trial unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 694. The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases. *See Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002) (stating that "we must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing" (internal quotation marks omitted)). Even in the context of a challenge to his death sentence, though, Petitioner must show that it is reasonably probable that the outcome would have been different had counsel performed adequately. *Strickland*, 466 U.S. at 694.

Here, trial counsel considered, investigated, and presented four theories at the penalty phase: (1) Petitioner was not the shooter; (2) a sentence of life imprisonment without parole was a greater punishment than death; (3) Petitioner was a

---

[5]In *Richter v. Hickman*, 578 F.3d 944, 968 (9th Cir. 2009) (en banc), we granted the habeas corpus petition of a convicted murderer, holding that the defendant's trial counsel rendered ineffective assistance by failing to investigate and present expert testimony on forensic blood evidence that would have supported the defendant's self-defense claim and contradicted the prosecution's theory of how the crime occurred. The facts of that case are easily distinguished from the facts here. The evidence that Petitioner claims was not discovered or not presented by his trial counsel would have been cumulative only or would have been at odds with trial counsel's reasonable efforts to portray Petitioner as less culpable. Unlike the evidence in *Richter*, the evidence here would neither have benefitted any of Petitioner's claims nor have contradicted the prosecution's theories.

valuable human being whose family members wanted him to live; and (4) Petitioner was dominated by his gang in general and by Williams in particular, and gang activity was an unavoidable part of Petitioner's environment.

Counsel made the strategic decision that their best chance to save Petitioner's life was to show that Petitioner was not the shooter or, at the very least, to raise a lingering doubt on that score. The decision to focus on the non-shooter strategy as a means to avoid the death penalty was entirely reasonable when taking into account the horrendous circumstances of the crimes and the prosecutor's main argument that Petitioner, as the sole shooter, was the most culpable of the perpetrators and deserved the death penalty. Further, the defense of "residual doubt has been recognized as an extremely effective argument for defendants in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 181 (1986); *see also Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004) (same). We have noted in the past a comprehensive study on the opinions of jurors in capital cases that concluded that " '[t]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence . . . . The best thing he can do, all else being equal, is to raise doubt about his guilt.' " *Williams*, 384 F.3d at 624 (quoting Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998)).

Counsel's second penalty-phase strategy was to show that life without the possibility of parole was a very grave punishment, perhaps a fate worse than death, and would protect society from Petitioner. In support of this strategy, counsel presented the testimony of Joey Upland, the head nurse at San Quentin State Prison. While on duty, Ms. Upland was in charge of medical care for 3,000 convicts. She testified that, generally, two inmates lived in a cell approximately 54 square feet in size. During lock-downs, the prisoners had no regular exercise and could go three to four weeks without a shower.

There were no towels, books, toilet paper, or access to a laundry, forcing prisoners to wash their clothes in toilets. The temperature in the cell could swell to 105 degrees in the summer and cool to nearly freezing in the winter. Ms. Upland testified that prison gangs stirred up a lot of trouble and that stabbings occurred two or three times a week. Due to high noise levels in the cells, prisoners lacked sleep and became disoriented. Sexual abuse among prisoners was also prevalent.

Counsel attempted to humanize Petitioner by presenting testimony regarding Petitioner's family, cultural and community background, the abuse and neglect he suffered at the hands of his mother, the pervasiveness of street gangs in his community and school, and the inherent problems of being involved in gangs. Several of his family members asked for mercy. Petitioner now argues that counsel should have investigated his past further and presented even more evidence regarding his childhood. But counsel made a reasonable strategic decision not to emphasize the abuse evidence because they deemed the non-shooter theory to have a higher likelihood of success. Counsel reasonably believed that it would not save Petitioner's life to argue to the jury that "this poor abused kid" deserves their sympathy or that Petitioner should be given life because his mother was an abusive alcoholic. The pertinent inquiry here "is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Babbitt*, 151 F.3d at 1173 (internal quotation marks omitted); *see also Williams*, 384 F.3d at 616. As long as a reasonable investigation was conducted, we must defer to counsel's strategic choices. *Strickland*, 466 U.S. at 690-91. As detailed above, counsel's extensive investigation was reasonable.

With regard to the gang-domination theory, counsel chose not to emphasize that theory during the penalty phase because doing so would have undermined the primary strategy of portraying Petitioner as the non-shooter. Counsel determined that this "substantial domination" defense actually supported the

prosecution's contention that Petitioner killed the victims under Williams' orders. Further, counsel was unable to obtain evidence that the gang made Petitioner commit the murders because he refused to cooperate with the strategy: He provided no useful information to counsel's retained gang experts, and he told counsel that he would cause a disturbance in the courtroom if counsel presented gang-domination evidence. Counsel ultimately chose not to call the gang experts as witnesses because they were unable to provide information helpful to Petitioner's case and because doing so may have opened the door to damaging rebuttal evidence about Petitioner's violent gang activities as an "enforcer." In these circumstances, counsel's decision not to emphasize the gang-domination strategy was reasonable.

Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner cannot demonstrate that he was prejudiced by his counsel's strategies at the penalty phase. Petitioner's counsel reasonably chose to pursue the four theories discussed above; additional information about Petitioner's childhood and gang activities would not have resulted in a different verdict by the jury. Because "the probability that the result would have been different is far from reasonable," *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000), we hold that Petitioner was not prejudiced by his counsel's representation at the penalty phase.

The United States Supreme Court's recent decision in *Wong v. Belmontes*, 130 S. Ct. 383 (2009) (per curiam), underscores our conclusion. In that case, the Supreme Court reversed a decision of our court holding that the defendant was prejudiced by his counsel's performance. The defendant had been convicted of murdering a woman in the course of a burglary; we held that counsel's performance was both deficient and prejudicial because "counsel's errors undermined

confidence in the penalty phase verdict." *Id.* at 384. The Supreme Court reversed. The Court first observed that the additional mitigation evidence cited in our decision "was merely cumulative of the humanizing evidence [that the defendant's counsel] actually presented; adding to what was already there would have made little difference." *Id.* at 387. Further, the Court held that presenting that additional evidence "would have put into play aspects of [the defendant's] character that would have triggered admission of the powerful . . . evidence [of a prior crime] in rebuttal. This evidence would have made a difference, but in the wrong direction for [the defendant]." *Id.* at 387-88

Similarly, here, Petitioner was not prejudiced by his counsel's decision to exclude additional mitigation evidence. Just as in *Wong*, that evidence is cumulative of what was presented at the penalty phase, and "adding to what was already there would have made little difference." *Id.* at 387. The additional evidence also contradicts the theories propounded by Petitioner's counsel, thereby pushing his case "in the wrong direction." *Id.* at 388.

In *Van Hook*, too, the Supreme Court addressed the question of prejudice. In that case, the Court emphasized that the testimony that the defendant claimed should have been presented would have added little; the defendant failed to show "why the minor additional details the trial court did not hear would have made any difference." 130 S. Ct. at 19-20. Additionally, the Court relied on the awful nature of the crime. The defendant was the sole perpetrator, who intended from the start to rob the victim, and then killed him and disfigured the body. *Id.* at 20. The defendant had committed several previous and subsequent robberies as well. *Id.* By ignoring the weight of these aggravating factors, the Sixth Circuit "overstate[d] . . . the effect additional mitigating evidence might have had." *Id.*

[16] Again similarly, in this case the proposed additional evidence was mostly cumulative of the information already

presented at the penalty phase trial. And, even more than in *Van Hook*, the weight of the aggravating factors was staggering. Petitioner set out to kill everyone in the Alexander house, including children sleeping in their beds, and he did so for money.

The dissent argues that the aggravating evidence presented during the penalty phase does not preclude a finding of prejudice, pointing to *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006), and *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), for support. Dissent at 10461-62. The dissent's reliance on those cases is misplaced. In *Hovey*, 458 F.3d at 927-28, the defendant's lawyer did not provide his key witness, a psychiatrist who examined the defendant for the first time just before presenting expert testimony, with records regarding the defendant's long history of mental illness. Had counsel done so, it would not have seemed to the jury that "the defense had concocted the mitigating mental illness evidence." *Id.* at 927. Similarly, in *Douglas*, we found prejudice where the defendant's counsel presented neither "a substantial amount of [his] social history" nor *any* evidence of his "serious and outstanding mental illness." *Douglas*, 316 F.3d at 1091.

Here, by contrast there was not a "total absence of evidence" regarding any aspect of Petitioner's life. *See id.* Petitioner's counsel, despite Petitioner's refusal to cooperate, presented testimony regarding his family, his background, and his abusive mother. The evidence to which the dissent points would have been cumulative or it would have undermined counsel's reasonable efforts to portray Petitioner as less culpable. Closely examining the record in this case makes clear that Petitioner was not prejudiced by his counsel's representation at the penalty phase.

*Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009), does not compel a contrary result. Hamilton's counsel's performance stands in stark contrast to that here. For example:

- There, defense counsel had never worked on a capital case before Hamilton's, and he failed to associate co-counsel. *Hamilton*, 583 F.3d at 1114. *See also Porter v. McCollum*, No. 08-10537, 2009 WL 4110975, at *5 (U.S. Nov. 30, 2009) (per curiam) (finding ineffective assistance of counsel at the penalty phase where the lawyer had never represented a defendant in a penalty-phase proceeding before). Here, by contrast, at the time of Petitioner's trial, defense counsel had served as a public defender for more than ten years, had tried a capital case in the past, and had earned a Level IV ranking in the public defender's office, meaning that defense counsel was the top trial lawyer in that office. Moreover, the main defense lawyer brought in an assistant to help in both the guilt and penalty phases of the trial.

- There, the defense "investigation consisted of at most five interviews," which took place shortly before jury selection began. *Hamilton*, 583 F.3d at 1114; *see also Porter*, 2009 WL 4110975, at *5 (holding that counsel was deficient for failing to obtain *any* school, medical, or military records, to interview *any* family members, or otherwise to investigate the defendant's mental health and background). Here, by contrast, counsel began the investigation well ahead of trial, seeking information from nine family members, church personnel, Boy Scout and Cub Scout leaders, and employers; consulting several experts; and reading voluminous records and documents regarding Petitioner's past. That investigation yielded relevant information concerning several viable mitigation strategies.

- There, the defense "presented only one witness . . . whose testimony occupies less than 5 pages

of the transcript." *Hamilton*, 583 F.3d at 1119. Counsel failed, without any legitimate explanation or reason, to uncover or to present evidence regarding the utterly horrific childhood that Hamilton had endured; that information would have been obvious with only the most cursory inquiry. *Id.* at 1119-28. Here, by contrast, the defense presented seven witnesses, who covered all the essential points the defense argued to the jury. For the most part, Petitioner's home life was *not* horrific. To the extent that it was, counsel pursued a reasonable strategy to downplay Petitioner's problems in order to pursue a non-shooter theory and create a lingering doubt about Petitioner's guilt.

- With respect to the prejudice prong, in *Hamilton* the defendant murdered his wife. *Id.* at 1102-04; *see also Porter*, 2009 WL 4110975, at *1, *6 (noting that the defendant murdered his former girlfriend and her new boyfriend). For that reason, evidence concerning the defendant's history of family abuse was highly relevant, both to explain the reasons for his conduct and to demonstrate that he would not be a danger to society at large. *Hamilton*, 583 F.3d at 1132-34. Here, by contrast, the additional evidence was mostly cumulative, and the nature of the crime itself overwhelmingly demonstrated Petitioner's danger to society.

Thus, *Hamilton* illustrates why, in this case, neither the performance nor the prejudice prong of *Strickland* is met.

[17] To summarize, given the fact that the jury heard substantial mitigating evidence and given the grim and gruesome facts of the crimes themselves, there is no reasonable probability that Petitioner would have escaped the death penalty

had counsel presented additional mitigation evidence or expert testimony at sentencing.

**AFFIRMED.**

---

PREGERSON, Circuit Judge, dissenting:

I part ways with the majority when it comes to the issue of ineffective assistance of counsel at the penalty phase. The majority opinion concludes that Cox's attorneys did not provide ineffective assistance during the penalty phase even though they failed to investigate critical, readily available records that would have revealed the full extent of Cox's abusive childhood. The majority reasons that this evidence would have been cumulative and also would have been inconsistent with trial counsel's non-shooter theory. In the alternative, the majority opinion concludes that any deficiency by Cox's attorneys during the penalty phase did not prejudice Cox because the omitted mitigation evidence was cumulative and the aggravating evidence was substantial. Because neither the record nor the law supports these conclusions, I dissent.

To prevail on his ineffective assistance claim, Cox must show: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, Cox's attorneys performed deficiently because they failed to conduct a reasonable investigation of Cox's abusive childhood. Cox's attorneys were on notice of Cox's juvenile dependency records and his abusive mother's arrest records and court files, but failed to obtain and review them. These records would have demonstrated that Cox suffered severe abuse until he was eleven years old and that he routinely was exposed to violence. Cox's attorneys's failure to obtain and present this evidence prejudiced Cox. Had the jury known the full extent of Cox's abusive childhood, it is reasonable to con-

clude that at least one juror would have voted that Cox suffer a life sentence rather than a sentence of death.

## I.  *Cox's Attorneys Provided Deficient Performance During the Penalty Phase of Cox's Trial*

Deficient performance exists when counsel's representation "[falls] below an objective standard of reasonableness." *Id*. at 688. Because "[i]t is imperative that *all relevant mitigating information* be unearthed for consideration at the capital sentencing phase," *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999), counsel performs deficiently if it does not conduct a reasonable investigation of the defendant's background. This inquiry should include investigation of the defendant's history of family abuse, *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc); a thorough examination of all readily available records, *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000); and the active pursuit of all relevant mitigation leads, *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007).

### A.  Cox's Attorneys Failed to Obtain All Reasonably Available Mitigating Evidence

I agree with the majority opinion insofar as "[t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence . . . ." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). I disagree, however, that conducting some mitigation investigation is tantamount to conducting a reasonable investigation. Both this court and the Supreme Court have found deficient performance when counsel conducted *some* investigation into mitigating evidence, but failed to discover *all* reasonably available mitigating evidence. *See*, *e.g.*, *Rompilla*, 545 U.S. at 381-83 (finding deficient performance because defense counsel failed to examine a court file on Rompilla's prior conviction, even though counsel interviewed Rompilla and several members of his family, and examined reports by three mental health experts); *Douglas v. Woodford*, 316 F.3d 1079, 1087 (9th Cir. 2003) (finding deficient perfor-

mance even though counsel's penalty-phase investigation included interviews of Douglas's "wife, son, friends, and neighbors").

Here, Cox's attorneys knew or should have known about the existence of Cox's juvenile dependency records and his mother's arrest records and court files, yet failed to obtain them. These readily available records would have demonstrated that Cox, eighteen years old at the time of the murders, had spent a substantial part of his formative years under the primary care of his mother, Sondra Holt, an alcoholic and a prostitute.[1] While under the care of his mother, Cox experienced severe abuse and was routinely exposed to violence:

- On June 3, 1970, when Cox was only four years old, Cox watched his mother try to kill his sister, Edrina Meyers.

- In August 1970, Everette Myers, the boyfriend and pimp of Cox's mother, was shot and killed outside the mother's door while Cox, four years old at the time, was inside the house.

- On December 15, 1970, when Cox was five years old, Cox witnessed his mother attacking a police officer with a knife.

- On January 23, 1971, when Cox was five years old, Cox witnessed his mother being taken away by ambulance after she was stabbed by a boyfriend.

---

[1]The juvenile dependency records reveal that Cox's mother, Sondra Holt ("Holt"), retained custody of Cox from when he was born on December 1, 1965, until he was declared a dependent child of the court on December 8, 1977. Holt was Cox's primary caretaker until 1971, although he also lived intermittently with his great-grandmother during this time. Moreover, Cox lived with Holt for eight or nine months in 1977.

- In 1973 or 1974, when Cox was eight or nine
  years old, Cox's mother set fire to the front door
  of the house of Cox's grandmother, where Cox
  was staying.

- In July 1977, when Cox was eleven years old,
  Cox's mother was arrested in front of Cox for
  assault with a deadly weapon.

- In August 1977, when Cox was eleven years old,
  Cox's mother pushed Cox up against the wall,
  struck him in the face several times, and gave
  him a black eye.

- In September 1977, when Cox was eleven years
  old, Cox's mother threatened him with a steak
  knife.

- On numerous occasions, Cox's mother became
  intoxicated to the extent that she could not pro-
  vide care or supervision for Cox.

All of this evidence of abuse could have been discovered
in Cox's dependency court file and in his mother's arrest
records and court files.[2] The State stipulated that Cox's attor-
neys were on notice that these documents were available and
could have been easily obtained. The State also stipulated that
Cox's attorneys "knew or should have known that Mr. Cox
and his siblings were removed from his mother's care as the

---

[2]Had Cox's attorneys interviewed additional family members, they
would have also discovered: (1) when Cox was slightly less than four
years old, his mother tried to kill Cox and his siblings; and (2) when Cox
was nine years old, he and his siblings witnessed their mother attempt sui-
cide. I see no need to reach whether Cox's attorneys's failure to interview
these family members constituted deficient performance because Cox's
attorneys's failure to obtain and present the evidence in Cox's dependency
court file and in his mother's arrest records and court files clearly consti-
tuted deficient performance.

result of court intervention" and that Cox's attorneys were "aware that Cox's mother had been in and out of prison during the time she raised Cox." Moreover, the State stipulated that Cox's attorneys had obtained Cox's school records. These records stated that Cox was placed in foster care at the age of twelve, indicating that Cox may have spent substantially more time under his abusive mother's care than other evidence suggested.

The majority opinion relies on the Supreme Court's recent decision in *Bobby v. Van Hook*, No. 09-144, 2009 WL 3712013 (U.S. Nov. 9, 2009) (per curiam) to conclude that Cox's attorneys performed a reasonable investigation because the unexplored documents would have only produced cumulative evidence.[3] Maj. Op. 10439, 10440. *Van Hook* is inapposite. In *Van Hook*, the Supreme Court held that trial counsel did not perform deficiently by failing to interview certain family members because trial counsel already uncovered extensive evidence of Van Hook's traumatic childhood. *Van Hook*, 2009 WL 3712013 at *19. The Court noted, "[t]his is not a case in which defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained." *Id.* (internal citations omitted).

Unlike trial counsel in *Van Hook*, Cox's trial counsel "failed to act while potentially powerful mitigating evidence

---

[3]The majority also cites to *Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009) to support its argument that Cox's counsel did not perform deficiently because any additional investigation would have been cumulative. *Bible* did not even reach the deficiency prong of the ineffective assistance of counsel analysis. *See id.* at 872 ("We hold that the absence of evidence that was cumulative of what had already been presented . . . does not undermine our confidence in the outcome of Bible's sentencing hearing. . . . {W}e cannot properly say that the Arizona court's decision that Bible suffered *no prejudice* was an unreasonable application of *Strickland*.") (emphasis added). Accordingly, reliance on this case is unfounded.

. . . would have been apparent from documents any reasonable attorney would have obtained." *Id.* Cox's trial counsel knew that Cox's mother had beaten and lost custody of her children more than once. Maj. Op. 10436. Yet they failed to obtain and review the documents that would be most relevant to demonstrating the severity of this abuse. It is hard to imagine documents more relevant to demonstrating the severity of Cox's childhood abuse than Cox's juvenile dependency records or Cox's mother's arrest records and court files. Cox's attorneys knew these records existed and could have easily obtained them. Any reasonable attorney would have obtained these documents and Cox's attorneys's failure to do so constitutes deficient performance. *See Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) ("[W]hen . . . indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued.") (internal quotation marks omitted).

## B. Cox's Attorneys's Failure to Obtain Cox's Juvenile Dependency Records and Other Evidence of Childhood Abuse Was Not a Strategic Decision

The majority opinion also contends that Cox's attorneys' failure to investigate Cox's traumatic childhood further was a "strategic choice" because the evidence would have been "at odds" with trial counsel's primary non-shooter theory.[4] Maj.

---

[4]There is also evidence that Cox's attorneys provided ineffective assistance with respect to the non-shooter theory. Cox's attorneys made no attempt to interview Stanley Cheathem ("Cheathem"), who was present at Ida Moore's house, the location where all the co-defendants congregated before the murders. Cox's attorneys even made notes to interview Cheathem, but never followed through.

Had Cox's attorneys interviewed Cheathem, they would have discovered the following:

• Williams had a "violent temperament," was paranoid, and was "scary to be with," and became "increasingly paranoid and unpredictable" when he was on crack.

Op. 10418-19. The majority opinion speculates that present-
ing evidence of Cox's abusive childhood "would only have
raised inferences that [Cox's] abusive childhood turned him
into a hardened criminal who was quite capable of murdering
four people" and "made it seem more likely that he was the
shooter." Maj. Op. at 10440. The majority opinion, however,
offers no support for such a conclusion.

To the contrary, the evidence of childhood abuse could
have easily raised inferences that evoked sympathy for the
eighteen-year-old Cox. Such evidence could have explained
why Cox ended up in a gang and how Cox ended up in a posi-
tion where he was aiding Williams in the perpetration of the
murders. Indeed, one of Cox's attorneys acknowledged that
the omitted childhood abuse evidence "would have been help-
ful to [the] defense" and "consistent with the themes that
[they] presented in mitigation." Where, as here, "counsel
offers no strategic reason for failing to perform what would
otherwise constitute the duty of a reasonably competent coun-
sel, we may not invent such a strategy by engaging in a 'post
hoc rationalization of counsel's conduct." *See Richter v. Hick-*

- In the weeks leading up to the murders, Williams was con-
  stantly hustling for crack, hustling for money for crack, and
  smoking crack.

- Cheathem did not take Williams seriously in the days leading
  up to the murders because "[Williams] was so cracked out and
  pumped up."

- The night before the murders Williams smoked crack.

The above testimony would have bolstered Cox's theory that Williams
was the actual shooter by demonstrating that Williams was likely under
the influence of crack cocaine when the murders occurred and that Wil-
liams had a strong propensity for violence, particularly while under the
influence of crack cocaine. Because Cox's attorneys clearly rendered inef-
fective assistance of counsel by failing to obtain and present evidence of
the severe childhood abuse suffered by Cox, I see no need to reach the
question whether Cox's attorneys also provided ineffective assistance by
failing to interview Stanley Cheathem.

*man*, 578 F.3d 944, 959 (9th Cir. 2009) (holding that counsel's failure to consult blood experts was not a strategic choice because counsel offered no reasoned explanation for the failure).

Moreover, the Supreme Court has acknowledged that childhood abuse evidence is not at odds with a theory that the defendant was not directly responsible for the crime, and that its discovery may actually change counsel's strategy. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003). Accordingly, Cox's attorneys's failure to obtain and present evidence of the severe abuse suffered by Cox at the hands of his mother was not a strategic decision, but a clear failure by defense counsel to conduct a reasonable investigation.[5]

## II.  Absent the Deficient Performance of Cox's Attorneys, a Reasonable Probability Exists That at Least One Juror Would Have Voted to Impose a Life Sentence Rather than a Death Sentence

Prejudice is established where, "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is one 'sufficient to undermine confidence in the outcome,' but is less than the preponderance more-likely-than-not standard.' " *Lambright*, 490 F.3d at 1121

---

[5]The majority opinion also notes that Cox refused to cooperate and threatened to "cause a disturbance" in court if negative information about his mother was presented. Maj. Op. 10437. Cox's failure to cooperate with his attorneys did not eliminate his attorneys's duty to investigate, and thus did not excuse his attorneys's deficient performance. *See, e.g., Douglas*, 316 F.3d at 1089-90 Moreover, the record clearly indicates that Cox's attorneys did not even heed his instructions, and in fact presented negative information about his mother to the court. Accordingly, Cox's attorneys's deficient investigation of Cox's severe childhood abuse cannot be excused by Cox's uncooperativeness or his instructions not to present negative information about his mother. *See Douglas*, 316 F.3d at 1089.

(quoting *Summerlin*, 427 F.3d at 640, 643). Because California requires that a unanimous jury impose a death sentence, the question here is whether "there is a reasonable probability that at least one juror would have struck a different balance [between life and death]." *Wiggins*, 539 U.S. at 537.

Relying on the Supreme Court's recent decisions in *Wong v. Belmontes*, 130 S. Ct. 383 (2009) and *Bobby v. Van Hook*, 130 S. Ct. 13 (2009), the majority opinion concludes that Cox was not prejudiced by his counsel's failure to obtain and present evidence of Cox's severe childhood abuse because the omitted mitigating evidence would have been cumulative and contradictory to the defense counsel's theories, and because the aggravating evidence was so great. Maj. Op. 10445, 10447-48. This conclusion is legally and factually unsupportable.

## A.   The Omitted Mitigation Evidence Was Not Cumulative of the Evidence Presented at Trial

The majority opinion erroneously concluded that the omitted mitigation evidence would be cumulative of the evidence presented at trial. In both *Belmontes* and *Van Hook*, the Supreme Court determined that the defendant was not prejudiced because omitted mitigating evidence would have been cumulative of what had been presented to the trial court. In *Belmontes*, the Supreme Court concluded that additional humanizing evidence, such as the fact that his family lived in "constant strife," that his sister died of a brain tumor, and that he was respectful to his grandparents, would have been cumulative of the evidence actually presented at trial, which highlighted Belmontes' "terrible" childhood and strong relationships with his family. *Belmontes*, 130 S. Ct. at 386, 387-88. Similarly, in *Van Hook*, the Supreme Court concluded that "the minor additional details" of Van Hook's traumatic childhood, which the interviews with additional family members would have revealed, did not prejudice Van Hook because counsel had already presented extensive evidence of

Van Hook's traumatic childhood at trial.[6] *Van Hook*, 130 S. Ct. at 19-20.

Here, the omitted mitigation evidence would not have been cumulative of the evidence presented at trial. At trial, Cox's attorneys only presented cursory details of Cox's abusive childhood and left the incorrect impression that Cox came from a loving and stable home and was raised primarily by his great-grandmother.[7] The omitted mitigating evidence would have shown that Cox spent many of his formative years with his abusive and neglectful mother, and was subject to a litany of traumatic events while under her care.

Specifically, the omitted mitigation evidence would have demonstrated that Cox, eighteen years old at the time of the murders, experienced his mother's violent behavior from the age of four to eleven. That behavior included threatening Cox with a steak knife, attempting to kill Cox's sister, and setting the residence at which Cox was staying on fire. Cox also observed a great deal of violence, which included witnessing his mother attack a police officer with a knife, watching his mother be taken away in an ambulance after her boyfriend stabbed her, and being on the scene when his mother's boyfriend was shot and killed. Accordingly, unlike in *Belmontes* or *Van Hook*, the omitted mitigation evidence in this case was not cumulative of the evidence presented at trial.

---

[6]At trial, Van Hook's counsel presented evidence that Van Hook started drinking as a toddler, began "barhopping" with his father at age nine, drank and used drugs regularly with his father from age eleven forward, frequently observed his father hold his mother at gun- and knife-point, watched episodes of sexual violence, and was beaten on at least one occasion. *Id.* at 18.

[7]Cox's great-grandmother erroneously testified that she raised Cox from infancy to age fourteen. The juvenile dependency records would have revealed that Cox's mother was his primary caretaker from his birth to age six or seven.

### B. The Omitted Mitigation Evidence Would Not Have Contradicted Counsel's Defense Theories

Relying on *Belmontes*, the majority opinion also erroneously concludes that the omitted mitigation evidence would have undermined counsel's primary non-shooter theory. Maj. Op. 10445. This case is clearly distinguishable from *Belmontes*. In *Belmontes*, the omitted mitigation evidence regarding Belmontes' mental state would have "opened the door" for the prosecution to introduce the "strongest possible evidence in rebuttal — the evidence that Belmontes was responsible for not one but two murders." 130 S. Ct. at 389.

Here, the introduction of evidence about Cox's abusive childhood would not have had any negative ramifications. As discussed above, the majority opinion's notion that childhood abuse evidence would contradict counsel's non-shooter argument is unfounded. The Supreme Court has noted that childhood abuse evidence is not at odds with a theory that the defendant is not directly responsible for the crime, *see Wiggins*, 539 U.S. at 535, and in this case, such evidence could have explained why Cox ended up in a gang and how he ended up in a position where he was aiding Williams in the perpetration of the murders. Accordingly, unlike in *Belmontes*, the omitted mitigation evidence would not have undermined counsel's trial strategies.

### C. The Aggravating Evidence Presented During the Penalty Phase Does Not Preclude a Finding of Prejudice

Relying on *Van Hook*, the majority opinion also concludes that omission of Cox's severe childhood abuse was not prejudicial because of the weight of the aggravating factors. Maj. Op. 10445. Specifically, the majority opinion points out the violent nature of the murders and that Cox participated in the murders for money. As a preliminary matter, the prosecution

did not present overwhelming evidence that Cox was the shooter or that the murders were for hire.

The two surviving witnesses, who were actually inside the house when the shootings occurred, gave a description of the shooter that matched co-defendant C.W. Williams ("Williams") rather than Cox. The witnesses described the intruder carrying the rifle as twenty-five to thirty-five years old, 5'10" to 5'11" and well-built with a dark complexion, short hair, and dark clothing. On the day of the murders, co-defendant Williams was in his mid-twenties, had a dark complexion, short hair and a muscular build, and wore a dark blue shirt and dark pants. Cox, on the other hand, was only eighteen years old, had a light complexion, a medium build and braided hair, and wore tan pants on the day of the murders.

Moreover, two of the prosecution's key witnesses, Ida Moore ("Moore") and Lisa Brown ("Brown"), were impeached during trial. These witnesses testified that Cox stated after the murders, "I just blew the bitch's head off." Moore was impeached by her inconsistent testimony at co-defendant Horace Burns's ("Burns") trial, during which she attributed the "I just blew the bitch's head off" statement to Williams, not Cox.[8] Brown was impeached by her statement to the police that she wasn't sure if Williams or Cox stated "I just blew the bitch's head off."

The prosecution presented evidence that Cox purchased a $3,000 Cadillac after the murders, but this evidence does not establish that Cox participated in the murders for money. Regardless of whether Cox was the shooter or committed the murders for money, the aggravating evidence does not preclude a finding of prejudice. There is no question that this case involves a horrible and senseless crime. Nevertheless, we

---

[8]At Burns's trial, Moore testified that the person who closed the van door stated "I just blew the bitch's head off." She further testified that Williams, not Cox, was the person who closed the van door.

have repeatedly found prejudice in capital cases that presented aggravating evidence which were equally, if not more, troubling than the facts here.

In *Hovey v. Ayers,* 458 F.3d 892 (9th Cir. 2006)*,* this court found prejudice even though Hovey was sentenced to death for the brutal kidnaping and murder of an eight year-old girl. Hovey bound the girl's wrists and thighs, fractured her skull in six places, and stabbed her fourteen times. *Id.* at 898. The jury also learned during the penalty phase that Hovey had previously been convicted of kidnaping another young girl. *People v. Hovey*, 749 P.2d 776, 795-96 (Cal. 1988). Nevertheless, this court found that Hovey's death sentence was prejudiced by his counsel's deficient performance. *Hovey*, 458 F.3d at 930-31. We explained that, even though Hovey's counsel called *eighteen* witnesses during the penalty-phase, Hovey's death sentence was prejudiced by his attorney's failure to provide all of the pertinent records to an expert witness. Id. at 924-25, 930-31.

In *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), this court found prejudice even though Douglas was sentenced to death for murdering two teenage girls. Douglas forced the two girls to have sex with each other at gunpoint and then forced the girls to orally copulate him. *People v. Douglas*, 788 P.2d 640, 647 (Cal. 1990), *overruled on other grounds by People v. Marshall*, 790 P.2d 676 (Cal. 1990). Douglas then choked, cut, and murdered the girls. *Id.* In addition to the horrific details of this crime, the jury also learned of Douglas's violent past. Two women testified that Douglas forced them to pose for nude pictures and perform sexual acts on him. *Douglas*, 316 F.3d at 1084. The jury also heard testimony that Douglas planned to torture and kill young women to make sex films. *Id.*

Despite the horrific nature of the killings and the significant aggravating evidence presented by the prosecution, we found that counsel's deficient performance prejudiced Douglas dur-

ing the penalty phase because Douglas's attorney failed to uncover and present extensive evidence of childhood abuse. *Id.* at 1089-91. Although the jury heard several of Douglas's family members testify, and learned that Douglas had been orphaned as a child and grew up poor, we explained that Douglas was prejudiced because the jury never learned the full extent of his troubled past. *Id.* at 1087-88, 1090.

The aggravating evidence in Cox's case was substantially weaker than in *Douglas* or *Hovey*.[9] Cox's prior criminal history included two juvenile robberies, which are less serious crimes than Douglas's depraved sexual acts or Hovey's prior kidnaping of a young girl. Moreover, the murders in Cox's case were less gruesome than the murders in *Douglas*, which involved sadistic torture, or in *Hovey*, which involved the kidnaping and murder of an eight year old girl.

Had Cox's attorneys conducted a reasonable investigation

---

[9]The majority opinion contends that Hovey and *Douglas* are distinguishable. Maj. Op. 10445-46. The majority opinion notes that *Hovey* involved defense counsel's failure to provide medical records to the psychiatrist, who was a key witness. Maj. Op. 10446. This is a correct interpretation of the case, but does not address my reason for citing the case— that prejudice was found notwithstanding substantial aggravating evidence.

The majority opinion provides more relevant and precise reasoning for its contention that *Douglas* is inapposite. The majority opinion notes that in *Douglas*, counsel had totally failed to present any evidence of Douglas's "serious and outstanding mental illness," and that Cox cannot point to a "total absence of evidence" regarding any particular area of his life. Maj. Op. 10446. I do not think that *Douglas* stands for the proposition that a "total absence of evidence" regarding a particular area is prejudicial while inadequate presentation of evidence in a particular area is not. In fact, such a reading of *Douglas* would be contrary to the well-settled notion that prejudice is determined by *balancing* aggravating and mitigating circumstances. *See Strickland*, 466 U.S. at 695. Accordingly, I believe that *Hovey* and *Douglas* support my view that Cox was prejudiced by the omission of his extensive childhood abuse, notwithstanding strong aggravating evidence.

of Cox's childhood and presented evidence of the severe abuse and trauma that Cox experienced as a child, there is a reasonable probability that at least one juror would have felt sympathy for Cox and voted differently. *See Wiggins*, 539 U.S. at 537. Accordingly, "consider[ing] *all* the relevant evidence that the jury would have had before it if [Cox's attorneys] had pursued a different path," *Belmontes*, 130 S. Ct. at 386, Cox's attorneys' failure to obtain and present evidence of Cox's extensive childhood abuse was prejudicial.

### D. The Length of the Jury's Deliberations During the Death Penalty Phase Supports a Finding of Prejudice

I also believe that the length of the jury's deliberations during the penalty phase of Cox's trial strongly supports a finding of prejudice. *See e.g. Daniels v. Woodford*, 428 F.3d 1181, 1209 (9th Cir. 2005) (finding prejudice, in part, because "[t]he jury deliberated for two days before returning a verdict of death"). Here, the jury deliberated for three days during the penalty phase of Cox's trial and asked to see key pieces of evidence regarding the identity of the shooter. The length of the jury deliberations and the jury's request for additional evidence indicates that the jury's decision to impose a sentence of death was not an easy one and that any additional mitigating evidence may have changed the outcome.

Accordingly, I believe that a reasonable probability exists that the additional mitigating evidence of childhood abuse would have led at least one juror to vote for a sentence of life in prison rather than a sentence of death.

### III. *Conclusion*

At the time of the murders, Cox was eighteen years old. Although the jury was left with the incorrect impression that Cox had experienced a fairly normal childhood, the record demonstrates that Cox suffered severe abuse at the hands of

his mother and was routinely exposed to extreme violence. I believe that Cox's attorneys provided ineffective assistance by failing to obtain and present evidence of Cox's severe childhood abuse, which was readily available in Cox's dependency court file and in Cox's mother's arrest records and court files. Had this evidence been presented to the jury, a reasonable probability exists that this evidence would have evoked sympathy for Cox and led at least one juror to vote for a sentence of life in prison rather than death.[10]

Accordingly, I dissent.

---

[10]In the face of counsel's clear ineffective assistance at the penalty phase of Cox's trial, I see no need to reach the shackling issue.