**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD A. LEAVITT,
          *Petitioner-Appellant,*

v.

A. J. ARAVE,
          *Respondent-Appellee.*

No. 12-35427

D.C. No.
1:93-cv-00024-BLW

RICHARD A. LEAVITT,
          *Petitioner-Appellant,*

v.

A. J. ARAVE,
          *Respondent-Appellee.*

No. 12-35450

D.C. No.
1:93-cv-00024-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
June 7, 2012—Pasadena, California

Filed June 8, 2012

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Reinhardt

6867

**COUNSEL**

David Z. Nevin, Nevin, Benjamin, McKay & Bartlett LLP, Boise, Idaho, and Andrew Parnes, Ketchum, Idaho, for appellant Richard A. Leavitt.

Lawrence G. Wasden, L. LaMont Anderson, Alan G. Lance and Jessica Marie Lorello, Idaho Attorney General's Office, Boise, Idaho, for appellee A.J. Arave.

**OPINION**

PER CURIAM:

Richard Leavitt is a convicted murderer who was sentenced to death by the state of Idaho. We have dealt with his case on two prior occasions. *See Leavitt* v. *Arave*, 383 F.3d 809 (9th Cir. 2004) (*Leavitt I*); *Leavitt* v. *Arave*, 646 F.3d 605 (9th Cir. 2011) (*Leavitt II*). Subsequent to our last decision the Supreme Court denied certiorari, ending his habeas suit.

Leavitt now seeks relief under Federal Rule of Civil Procedure 60(b), claiming that *Martinez* v. *Ryan*, 132 S. Ct. 1309

(2012), renders him eligible to pursue ineffective assistance of counsel claims on which he had ostensibly defaulted. In a separate case, Leavitt petitions the district court to order the Blackfoot Police Department to send evidence related to his crime to a lab for forensic testing.

The district court denied relief in both cases. Leavitt appeals.

**[1] 1. 12-35450 (*Martinez* Claim).** In order to bring a successful *Martinez* claim, "a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one . . . ." *Martinez*, 132 S. Ct. at 1319. Under *Strickland* v. *Washington*, 466 U.S. 668, 687 (1994), an ineffective assistance claim would require Leavitt to prove his trial attorneys' performance was both "deficient" and "prejudicial" to his defense. "There may be cases where the record is devoid of sufficient information necessary to evaluate whether [post-conviction relief] counsel was ineffective [in failing to raise such a claim] and, as a result, remand under *Martinez* would be necessary. However, . . . that is not the case here." *Sexton* v. *Cozner*, No. 10-35055, 2012 WL 1760304, at *9 (9th Cir. May 14, 2012).

**[2]** Leavitt argues that his trial counsel was deficient in failing to object to prosecutorial misconduct at trial. We have previously addressed this claim on the merits and held that, even if one of the prosecutors' actions "deviat[ed] from propriety," it was "not enough to make any difference in the result." *Leavitt I*, 383 F.3d at 835. Therefore, even if trial counsel was ineffective in failing to challenge the prosecutor's actions, no prejudice resulted from such ineffectiveness.

**[3]** Leavitt also claims his trial counsel should have objected to testimony from Leavitt's former girlfriend that he had once displayed a knife immediately before the two had sex. He admits, however, that we previously found this evidence standing alone to be "harmless." *See Leavitt I*, 383 F.3d

at 829. Therefore, even if Leavitt's trial counsel was deficient under *Strickland* when he failed to object, this did not prejudice Leavitt's case.

**[4]** Leavitt further contends that his trial counsel was deficient when he acquiesced in six reasonable doubt and presumption of innocence instructions that misstated the law. However, we previously reviewed five of the six instructions on the merits and rejected Leavitt's challenges. *Leavitt I*, 383 F.3d at 821-22. An instruction identical to the only other instruction was found not to be a constitutional violation when read "in the context of the instructions [read in that case] overall." *Rhoades* v. *Henry*, 638 F.3d 1027, 1044-45 (9th Cir. 2011); *see also Leavitt I*, 383 F.3d at 820 ("[R]easonable jurists in 1989 [, the year the Idaho Supreme Court handed down its decision in Leavitt's state case,] would still not have felt compelled by [Ninth Circuit caselaw] to find that [the jury instruction] was constitutional error . . . ."). Leavitt's counsel's failure to object was not deficient under *Strickland*.

**[5]** Finally, Leavitt claims his trial attorneys erred by failing to have his expert witness testify that two of the blood samples found together at the scene of the crime had not mixed and thus were not deposited at the same time. "The choice of what type of expert to use is one of trial strategy and deserves a 'heavy measure of deference.' " *Turner* v. *Calderon*, 281 F.3d 851, 876 (9th Cir. 2002). Leavitt's trial attorneys apparently decided not to call Leavitt's expert to the stand because most of his testimony would have corroborated the government's. Regardless, the failure to introduce the testimony of Leavitt's expert witness doesn't rise to the level of *Strickland* prejudice, which requires a showing of a "reasonable probability . . . [that] the result of the proceeding would have been different" if not for the attorney's errors. *Strickland*, 466 U.S. at 694. As the district court stated, "Leavitt has pointed to no other evidence tending to show that a significant amount of time must have elapsed between the deposit of the

two blood types on the clothing." Memorandum Decision and Order, *Leavitt* v. *Arave*, No. 1:93-cv-0024 (D. Idaho June 1, 2012). And, the state produced other evidence that Leavitt had left his blood at the crime scene at the time of the killing. *Id.*

**[6] 2.　No. 12-35427 (Testing Claim).** Leavitt also asks the district court to compel the Blackfoot Police Department to submit for forensic testing blood samples taken from the crime scene. He concedes that the testing motion "addresses primarily concerns with clemency proceedings." He argues the district court has jurisdiction to provide discovery in support of his pending Rule 60(b) motion in his habeas case. He has not shown good cause for such a discovery request, however, as he has not explained how the testing that he seeks would substantiate his underlying claim that his trial counsel was ineffective in failing to obtain appropriate testimony from his serology expert.

**[7]** As to clemency, Leavitt argues that the district court has jurisdiction to grant the testing motion under 18 U.S.C. § 3599(f), so he can use it in support of his state clemency petition. But, section 3599(f) provides for "nothing beyond . . . funding power" and doesn't "empower the court to order third-party compliance" with Leavitt's attorneys' investigations. *See Baze* v. *Parker*, 632 F.3d 338, 342-43 (6th Cir. 2011).

**AFFIRMED.**

---

REINHARDT, Circuit Judge, concurring:

I am not free to do other than join fully in the court's per curiam opinion affirming the denial of Leavitt's motion for relief from the judgment under Rule 60(b) of the Federal Rules of Civil Procedure. I write separately only to explain my disagreement with the current state of the law which per-

mits the execution of individuals, including Leavitt, on the basis of trials and sentencing proceedings that do not afford them the protections and process that the Constitution requires. In my opinion, it is not good enough that capital defendants are convicted on the basis of instructions that misstate the meaning of reasonable doubt or tell the jury, in violation of the Due Process Clause, that constitutional protections are intended for the benefit of the innocent only. Capital defendants do not, in my view, receive an adequate sentencing hearing when a lawyer fails to follow through on a medical expert's advice that the defendant receive a brain scan in order to determine whether he suffers from an injury or ailment that may fundamentally affect his judgment or his conduct. It is not good enough that we forfeit a capital defendant's legitimate constitutional claims because his lawyers failed to comply with the impenetrable procedural rules designed to make habeas relief unavailable to all but the most fortunate and even to deny such relief regardless of the merits of a defendant's claims if the state judges' erroneous interpretation of the Constitution could have been made by reasonable judges. We are far too willing in capital cases to accept the results of trials that are marked by errors on the assumption that those errors did not influence the jury. As long as we are willing to treat capital punishment as an acceptable form of administering justice in our society, the proper approach, under my view of the Constitution, would be to insist that, as the Supreme Court once said, "Death is different," and not permit the execution of individuals by the state as a result of proceedings that fail to comply in all respects with the dictates of the Constitution. Error is simply not harmless, nor is it acceptable, when it is part of a process that leads to a state's putting its citizens to death.

The long procedural history of this case reads like a textbook account of the obstacles to justice erected by modern habeas doctrine. In 1996, the district court held that Leavitt's claims regarding the ineffectiveness of his trial and resentencing counsel were procedurally defaulted. In doing so, the dis-

trict court relied on a rule—recently changed by the Supreme Court—that any ineffectiveness on the part of a petitioner's state post-conviction counsel could not excuse the procedural default of his claims. Four years later, the district court granted a writ of habeas corpus on the basis of an unlawful jury instruction. We reversed the grant of habeas relief on the ground that the jury instruction claim was barred by the non-retroactivity doctrine of *Teague v. Lane*. In a footnote, we noted that the district court had been wrong to dismiss as procedurally defaulted all of Leavitt's claims as to the ineffectiveness of his trial counsel, but—with almost no analysis—we held that the two non-defaulted claims failed on the merits. We also reversed the district court's ruling that Leavitt's claim concerning the ineffectiveness of his resentencing counsel was procedurally barred, and we remanded for that claim to be heard. On remand, the district court again granted a writ of habeas corpus on the basis that Leavitt's counsel had been constitutionally ineffective. Yet again, we reversed the grant of relief. Now we confront a motion for relief from the judgment that the rules prevent us from granting.

Nearly absent from this litany is any discussion of what ought to be the focus of federal habeas review—whether Leavitt received a fair trial and sentencing proceeding that respected his rights under the Federal Constitution. Instead, the case remained in the federal courts for nearly two decades as the result of a series of disagreements about whether various procedural requirements were or were not satisfied at each of various stages in the state and federal proceedings. Comity has value. The habeas jurisdiction of the federal courts is not unlimited. At some point, however, these uncontroversial premises have been transformed into a set of strictures that prevents all but the most unusual of petitioners—those whose counsel have managed to comply at every turn with the ceaselessly changing and ever expanding series of rules—from presenting the merits of their constitutional claims to any federal court. This harsh and mechanical process undermines the protection of the Great Writ.

Leavitt's trial and sentencing failed, at numerous points, to comply with the Constitution. As we recognized in our first opinion in this case, one of the instructions given to the jury —an instruction "that the presumption of innocence is not intended to aid the guilty-in-fact"—has for at least half a century been recognized by our court as erroneous. *See Reynolds v. United States*, 238 F.2d 460, 463 (9th Cir. 1956). In *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), the Supreme Court held that an unlawful definition of reasonable doubt by a state court violates the Federal Constitution. Because Leavitt had the misfortune to be convicted before *Cage* was decided, however, his claim was barred by *Teague*— notwithstanding that by the time his case reached our court, *Cage* had been the law for a decade and a half. In other words, we told Leavitt, we know that your jury instruction violated the longstanding law of our Circuit, but you lose because the Supreme Court had not yet made clear by the time of your conviction that such a violation by a state court offends the Federal Constitution.

Then there were the multiple instances in which the trial violated Leavitt's rights in ways that we held were not quite bad enough to have changed the outcome. First, although a jury instruction "imposed the burden of proving an alibi on Leavitt, which is clearly wrong," we found no reasonable likelihood "that this instruction . . . caused Leavitt's jury to base his conviction on a degree of proof below that required by the Due Process Clause," 383 F.3d at 822, or that any reasonable juror "would have bought his alibi," *id.* at 833. Second, although it "was arguably improper" for the prosecutor "to comment upon [Leavitt's] exercise of his right to remain silent" at an "arguably . . . judicial . . . proceeding," we held that "any error was harmless." *Id.* at 828. Third, although any rationale for admitting evidence that Leavitt had displayed a knife during a previous sexual encounter "was pretty thin," and the rationale for admitting other knives was "[t]hinner still," we were unwilling to say that "the knife evidence . . . had substantial and injurious effect or influence in determin-

ing the jury's verdict." *Id.* at 829 (internal quotation marks omitted). Fourth, although the prosecutor committed serious misconduct by arguing to the jury that it was "a link in a chain of law enforcement which includes the police, the prosecutor, and the judge," we did not conclude "that the trial was so infected with unfairness as to be a denial of due process" or that "this deviation from propriety was . . . enough to make any difference in the result." *Id.* at 834-35. The harmless error doctrine led us to look past numerous violations of the Constitution on the basis of our *own* judgment, not the jury's, that the evidence against Leavitt was strong.

Next, our second reversal of habeas relief constituted a legal error and worked a serious injustice. As I wrote in dissent from that decision, had Leavitt's counsel on resentencing "made a motion for the MRI examination of his brain that the court-appointed neurologist had recommended," that "examination would have revealed Leavitt's organic neurological disorder—powerful mitigating evidence that could well have altered the sentencing decision of the trial court." *Leavitt v. Arave*, 646 F.3d 605, 617 (9th Cir. 2011) (Reinhardt, J., dissenting). That failure "necessarily undermines any reasonable jurist's confidence in the outcome of the sentencing proceeding," and the majority decision to the contrary "disregard[ed] the controlling law and the compelling facts of this case." *Id.* at 626.

There is one further problem that Leavitt's case illustrates: under current law, defendants, even capital defendants, have no constitutional right to require the state to provide evidence in its possession for DNA testing. Leavitt belatedly sought such evidence, and the State advised us that the decision whether to release it was up to the Chief of Police of Blackfoot. Surely, where evidence of this importance may in some cases—especially in some capital cases—definitively answer the question of guilt or innocence, the Constitution must provide a better method of determining whether that evidence may be tested before the State executes a defendant.

As noted at the outset, I recognize that the law requires us to do what we have just done—ended Leavitt's last chance that the Constitution would be complied with before he is executed by the State. This result, however, reflects the deplorable state of the law rather than a determination (on my part, at least) that Leavitt has in fact been treated fairly. Whether or not the very existence of capital punishment comports with the Constitution—a question which, for now, the Supreme Court has resolved—we must demand a higher standard of constitutional values in capital trials, and we must afford condemned prisoners a full opportunity to be heard on their constitutional claims before we send them to their deaths. We are failing to meet these obligations today.